THOMAS H. FOSTER *et al.*

*v.*

JAMES B. WALLER *et al.*

1. FACTOR — *liability for loss on sale on 'change.* Where a factor, or commission merchant, makes a sale on 'change for his principal, he will be held to a very high degree of vigilance in learning the pecuniary ability of the purchaser. To protect himself in case of a loss growing out of the insolvency or failure of the purchaser to pay for the goods sold, he must resort to all available sources of information that are accessible, and inattention, or carelessness, in this respect, will render him liable for any loss sustained thereby, but he will not be held as a guarantor of such a sale.

2. Where one hundred barrels of flour were shipped by rail to a commission merchant in Chicago, for sale, and he sold the same on 'change, and gave the purchaser an order, on the same day, to get the flour at the railroad depot, and ordered an inspection, and on the next morning, having received the certificate of inspection, he attached the same to the bill, and sent them to the purchaser's place of business, but the latter was not found, and, on inquiry, it was found that the purchaser had got the flour, and procured a warehouse receipt therefor, which he negotiated to an innocent purchaser, so that the flour could not be reclaimed, and the price was not paid. It appeared that the purchaser's credit was not good, and that fact might have been learned by reasonable effort and inquiry. In a suit by the commission merchant against the party for whom the sale was made, to recover expenses incurred in trying to reclaim possession of the flour, it was *held* that he could not recover.

APPEAL from the Superior Court of Cook county; the Hon. JOSEPH E. GARY, Judge, presiding.

This was an action of assumpsit, brought by Thomas H. Foster and Augustine N. Lee, partners, under the firm name of Foster & Lee, against James B. Waller and A. R. Alexander, executors of the will of R. A. Alexander, deceased. The opinion states the material facts of the case.

Messrs. DENT & BLACK, for the appellants.

Messrs. DICKEY & CAULFIELD, for the appellees.

Mr. CHIEF JUSTICE WALKER delivered the opinion of the Court:

It appears that R. A. Alexander was the owner of two flouring mills, one situated at Montgomery, and the other at Aurora, in this State; that he made an arrangement with Chase & Broadhead that they should operate the mill at Montgomery for one year from the 1st of September, 1866; and it was also agreed, that Chase was to have one-fourth, and Broadhead one-fifth, of the net profits arising therefrom. The agreement was not reduced to writing until the 7th of January, 1867. Alexander subsequently, and before the expiration of the year, wrote

a letter to Chase & Broadhead, that "As regards the arrangement for the next year for carrying on the milling business, I supposed that the same understanding existed as for the present, and you can draw up a memorandum to that effect, and send it to me for signature." After writing this letter, and before any memorandum was ever executed, Alexander died, but Chase & Broadhead continued to run the mill as before, until the contract was renewed on the 1st of September, 1868, by a written memorandum, signed by the executors of Alexander, and by Chase & Broadhead, by which last memorandum the mill at Aurora was included on the same terms. Chase & Broadhead operated both mills until the end of the time, and paid to the executors their share of the profits, so far as they had been received.

In February, 1868, after Alexander's death, Chase & Broadhead shipped to appellants, their commission merchants, one hundred barrels of flour, for sale. They soon afterward sold it to F. Smith & Co. The sale was made on 'change, and an order was the same day given to Smith to get the flour at the Burlington depot. It was ordered to be inspected. Appellants received the certificate of inspection the next morning, which was attached to the bill, and sent to Smith's place of business, but he was not in, and he was not found that day. On inquiry it was found that he had got the flour, and taken it to the Chicago Dock Company's warehouse, received a receipt for it, and negotiated it with Snydecker & Co., bankers. Appellants, in their names, replevied the flour, and, on a trial of the case, recovered the property; but the case was brought to this court, where the judgment of the court below was reversed, and, on another trial, judgment was rendered against appellants.

Thereupon, suit was brought against appellants on the replevin bond, and the amount of Snydecker's lien on the flour was recovered, and has been paid by appellants. They then brought this suit against the executors of Alexander, to recover back the amount thus paid, and also costs and attorney's fees

expended in the replevin suit. On a trial before the court, a jury having been dispensed with by the parties, the court found for, and rendered a judgment in favor of, defendants, which we are asked to reverse, on several grounds.

The question to which we propose to turn our attention is, whether appellants used such precaution as is required of them, under the usages of trade in Chicago, which, it seems, regards a transaction of this character as a cash sale. With such a usage, so widely different from what is believed to prevail in other countries and commercial marts, and in which the great mass of our people have so vital an interest, we must hold that, when a commission man makes such a sale, he must be held to, at least, all reasonable diligence to learn the pecuniary solvency of the purchaser. He must, to be protected, be required to resort to all available sources of information that are accessible. Inattention, or carelessness, must be held to render him liable for loss thereby sustained. Whilst he will not be held as a guarantor of such sales, he will be held to a high degree of vigilance in learning the ability of the purchaser.

We are, from an examination of the evidence preserved in the record, of the opinion that appellants failed to use all reasonable precautions to learn whether Smith & Co. were solvent. They seem, so far as we can see, to have made no inquiries. They rather relied on the former standing of the house, which seems to have depreciated for some time before the sale. A witness in the commission business, of whom Smith had been in the habit of purchasing, says he had become slow, and he refused to sell him flour unless he would pay the money before delivery. He and others say his credit was not good. And the evidence shows that he had counterfeited the inspector's stamp, and used it, for which he had been reported to the directors of the board of trade, of which he and appellants were members, and for which he was reprimanded and threatened expulsion if it should be repeated. This all tends to show the man was not in good pecuniary credit, and not only so, but was

dishonest; and, from the evidence, we infer that these facts could have been readily learned, had slight effort and inquiry been made, as witnesses say both facts were commonly spoken of among business men and members of the board of trade.

On the other hand, an equal number of witnesses say they supposed Smith was solvent, and had not heard it questioned before he failed, and that they had not heard of his having used the counterfeit stencil-plate to imitate the inspector's mark on his goods. All this tends to prove that they had not heard of what others had, and which proved to be well founded. It seems to us that little effort and slight inquiry would have led to knowledge that would have deterred any prudent man from making the sale as this was done. And they should, at least, have either obtained the money before parting with the control of the flour, or have availed themselves of all reasonable and accessible sources of information to have learned whether they incurred any risk in so selling, and should not have done so if they found there was any danger of loss.

Nor was the fact that he was a member of the board of trade any guaranty of his solvency, as witnesses testified on the trial. Information as to his bad standing, for solvency, and his want of integrity as a man, were accessible to appellants without requiring any great effort, and it was their duty to have made inquiry. Having failed to do so, they must bear the loss. The court below was, we think, fully warranted in its finding, and the judgment must be affirmed.

*Judgment affirmed.*